410 So.2d 674 (1981)
Claude A. FONSECA
v.
MARLIN MARINE CORPORATION, Alfred Cenac, Jr. and the Home Indemnity Company.
No. 80-C-1522.
Supreme Court of Louisiana.
March 2, 1981.
On Rehearing September 8, 1981.
*675 J. Nelson Mayer, III, Heisler, Wysocki & DeLaup, New Orleans, for plaintiff-applicant.
Rudolph D. Hargis, Jr., Philip J. McMahon, McMahon & McCollam, Houma, for defendants-respondents.
DIXON, Chief Justice.
The plaintiff in this suit seeks damages in tort, or, alternatively, workmen's compensation *676 benefits, for injuries he incurred when he fell from the partially completed second floor of a barn.
A carpenter with about twenty-six years experience, plaintiff was hired by defendant Cenac to complete the construction of a barn which Cenac and some friends had begun. Cenac planned to use the barn to house some horses that he raised and sometimes showed as a hobby. At the time plaintiff undertook the job, the barn was approximately forty to sixty per cent complete. (Estimates varied from twenty-five to seventy-five per cent). Cenac agreed to pay the plaintiff and his two co-workers a set hourly wage at the end of each week of work; he also agreed to pay for the necessary materials. Plaintiff and his co-workers were paid with Marlin Marine checks; however, the checks were drawn on Cenac's personal account with the corporation, rather than on Marlin Marine's payroll or general checking account. No payroll deductions were withheld. Cenac was the president and majority stockholder of Marlin Marine and the corporation was indebted to him for funds he had loaned it in the past. The corporation established the personal account for Cenac so that he could draw against it for personal projects and thus reduce the corporation's debt to him.
On September 14, 1971, two or three days after starting the job, Fonseca was standing on some boards in the barn hoisting up lumber which he planned to use to complete the upper section of the barn. The boards were actually the floor boards of the upper level of the barn; they were cypress planks, about an inch thick, six to twelve inches wide, and about eight feet long. They were not nailed down, but rested on the ceiling joists to form a kind of scaffold. The boards and joists were in place when Fonseca undertook the job. While he was walking on one of the planks with a piece of lumber, plaintiff stepped on the unsupported end of a board which fell slightly short of the joist. The plank flipped up and he fell, injuring his back and legs. Plaintiff completed the barn, but suffered increasing pain in his back and had to stop working in December, 1971.
Plaintiff filed his original suit on September 12, 1972 and named numerous defendants. By the day of trial, February 14, 1977, the only defendants remaining were Marlin Marine Corporation, its workmen's compensation insurer, The Home Indemnity Company, and Alfred Cenac, Jr. In his petition plaintiff prayed for tort damages; alternatively, he sought workmen's compensation benefits for total and permanent disability. The trial court rendered judgment for the defendants and dismissed both causes of action. The Court of Appeal affirmed. 385 So.2d 341 (La.App. 1st Cir. 1980).
Plaintiff does not argue his workmen's compensation claim before this court. Nevertheless,[1] we have examined the record to determine if he is entitled to recover any benefits under our workmen's compensation law. We agree with the lower courts that he is not covered.
The facts in this case support the conclusion that Fonseca had no employment relationship with Marlin Marine Corporation, either as employee or independent contractor. Therefore, he is not entitled to recover any workmen's compensation benefits from the corporation. The record supports the conclusion that Fonseca was engaged by Cenac, acting as an individual rather than as a corporate officer, to complete the construction of the barn. Fonseca's right to obtain workmen's compensation benefits from Cenac requires a determination that the barn was in some way *677 connected with Mr. Cenac's trade, business or occupation. We recognize that an individual may have several different businesses, and we look to the facts of each particular case to determine whether or not construction, renovation or repair work is connected with the trade, business or occupation of the employer. Doss v. American Ventures, Inc., 261 La. 920, 261 So.2d 615 (1972). Generally, we have held that where the building being repaired or constructed houses the business or business equipment of the employer, or is leased by an employer engaged in the business of leasing or renting, the employee injured while working thereon is entitled to workmen's compensation benefits.[2] On the other hand, where the employee is injured while working on property of the employer which has no connection with the employer's business, he is not covered by the workmen's compensation law.[3]
The uncontradicted testimony in this case indicates that the barn was not connected with Cenac's business. Cenac did not plan to use the barn to store business equipment. He did not intend to lease the barn. He was building the barn simply to house some horses he raised as a personal hobby. Given these facts, Fonseca does not come within the coverage of the workmen's compensation act.
Since Fonseca is not covered by the provisions of our workmen's compensation law, he is entitled to bring an action against the defendants under general tort law. He presents three different grounds for recovery. First, he contends that the defendants breached their duty to provide him with a safe place to work. R.S. 23:13; C.C. 2315, 2316.[4] Secondly, he argues that they failed to construct a safe scaffold, as required by R.S. 40:1672.[5] Finally, he contends that the *678 owner of the barn is liable to him in damages under C.C. 660 and 2322.[6] The Court of Appeal held that the plaintiff failed to prove any negligence on the part of the defendants. It added that, at any rate, plaintiff was contributorily negligent in working on a scaffold of unnailed planks and hence was precluded from recovering damages. Citing Temple v. General Insurance Co. of America, 306 So.2d 915 (La.App. 1st Cir. 1974), writ refused 310 So.2d 643 (La.1975), for the proposition that C.C. 2322 does not apply to buildings under construction, the court also held that the plaintiff could not recover under that article.
In Temple, the injured plaintiff was a brickmason's helper who was repairing the brick wall of a partially constructed apartment building. A storm had blown the bricks down and the subcontractor's workmen relaid them in rainy weather. The next day, while plaintiff was working on a scaffold, the wall collapsed and knocked him down. The trial court noted that the wall's collapse might have been attributable to the fact that the bricks had been laid in rainy weather. The Court of Appeal noted that control of the wall during the reconstruction process was with the subcontractor, rather than with the owner. It absolved the owner of liability because it thought that the plaintiff failed to prove that the wall's fall was due to a vice in construction or failure to repair.
The case at hand is distinguishable from Temple because the plaintiff's injury was clearly caused by a defect in the original construction of the floor or scaffold. Fonseca took the work over directly from Cenac, and neither Fonseca nor his helpers had anything to do with the placing of the planks. The record indicates that the planks were in place when Fonseca began working on the barn, and were not moved by him. Moreover, the record reveals that Cenac assured Mr. Fonseca that the work would be easy because the planks were already in place and had already been used by him and his friends.
Cenac is liable for Fonseca's injuries in two capacitiesas owner of the barn and as custodian of the barn when the defective scaffolding was erected. An examination of cases and commentators indicates that there is disagreement as to whether C.C. 2317[7] or C.C. 2322 should govern the imposition of liability in situations where a building or component falls and causes injury in the course of construction. Some French commentators believe that article 1384 of the Code Civil (the counterpart to our article 2317) should govern accidents occurring in the course of construction, and that the party having control or custody of the injuring thing should be held liable. Savatier, Traité de la responsabilite civile en droit français, I,N. 419. Others, such as Mazeaud and Tunc, define a building as any construction, any assembly of material destined by man to make a work above the ground, and thus bring a building under construction within the purview of C.C. 2322 (French code article 1386). Stone, Tort Doctrine, 12 La.Civil Law Treatise, § 345 (1977). Belgium apparently allows an action against the owner of a partially constructed building on the theory that the *679 "proprietaire" acquires the building as it is constructed from day to day, from level to level. Stone, supra.
Both C.C. 2317 and 2322 impose strict liability, or liability without fault, on certain individuals. Article 2317 holds an individual responsible for the damage caused by things in his custody. Loescher v. Parr, 324 So.2d 441 (La.1975). Article 2322 makes the owner of a building answerable in damages to any person who is injuredwhile rightfully inside or outside the buildingin an accident caused by the owner's neglect to repair the building or from a vice (defect) in its original construction. Olsen v. Shell Oil Co., 365 So.2d 1285 (La. 1978). Both articles base liability on statusownership or custodyrather than on personal fault. The owner or custodian cannot escape liability by claiming that he was ignorant of the defect or that the defect was difficult to discover. He is absolved of liability only if he can prove that the harm was caused by the fault of the victim, the fault of a third person, or by irresistible force. Loescher v. Parr, supra; Olsen v. Shell Oil Co., supra.
A party seeking damages under article 2317 must prove that he was injured by a defective thing which was in the care or custody of the defendant. Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980); Loescher v. Parr, supra. In most cases, the custodian is the owner of the thing, as he is the person who has actual control or responsibility for the thing.[8]
The party who seeks damages under article 2322 must prove that his injury was caused by the ruin of a building owned by the defendant, and that the ruin was attributable to a vice in the building's original construction or to a failure to repair it. The terms "building" and "ruin" have not been precisely defined. The structure must have some permanence, but it need not be suitable for habitation. Mudd v. Travelers Indemnity Co., 309 So.2d 297 (La.1975); Cothern v. LaRocca, 255 La. 673, 232 So.2d 473 (1970). Wharves and fixed drilling platforms have been considered buildings under article 2322. Olsen v. Shell Oil Co., supra; Allain v. Frigola, 140 La. 982, 74 So. 404 (1917). Ruin has sometimes been literally construed to refer only to the actual fall, collapse, or giving way of a building or a substantial component thereof. Davis v. Royal-Globe Insurance Co., 257 La. 523, 242 So.2d 839 (1970), cert. denied 403 U.S. 911, 91 S.Ct. 2208, 29 L.Ed.2d 688 (1971); Hornsby v. Ray, 327 So.2d 146 (La.App. 3d Cir. 1976), writ refused 330 So.2d 293 (La.1976); Parker v. Brawley, 306 So.2d 793 (La.App. 2d Cir. 1975). At other times the term has been broadly construed to permit recovery for injuries caused by defects in parts or appurtenances to structures. Olsen v. Shell Oil Co., supra; Ellsworth v. Tedesco, 235 La. 679, 105 So.2d 264 (1958) defective water heater; Leaber v. Jolley Elevator Corp., 354 So.2d 746 (La.App. 4th Cir. 1978), writ denied 356 So.2d 1010 (La.1978) malfunctioning elevator; Fontenot v. Sarver, 183 So.2d 75 (La.App. 3d Cir. 1966) unguarded window fan.
In the case before us, the defendant Cenac was the owner of the barn. He was also its custodian at the time the "scaffold" was erected. The barn was sufficiently constructed to constitute a building: its walls were up, the first floor was up and the second floor was partially completed. Most of the witnesses at trial testified that the barn was forty to sixty per cent complete when Fonseca began work. Even if the barn did not constitute a building, it was clearly a defective thing when Fonseca began work; a plank that was supposed to reach a supporting joist was too short and did not reach it. The planks had been placed across the ceiling joists by Cenac or one of his friends. Neither Fonseca nor anyone else moved them. The length of the *680 board created an unreasonable risk of injury and led to the accident. Mr. Fonseca noted at trial that it was common practice to work on loose boards; he did not expect scaffold boards to be nailed down, but he did expect them to reach from one support to another.
The defense argues that Mr. Fonseca is barred from recovering by his own fault, or because he assumed the risk of working on the loose boards in a building he knew was partially constructed by amateurs. While it is true that Mr. Fonseca assumed the risk of working on unnailed boards, he did not assume the risk of working on a board that was unsupported by joists. A plaintiff can only be said to have assumed a risk if it is shown that he voluntarily exposed himself to a known and obvious danger. The defect that caused Mr. Fonseca to fall was neither known nor obvious. The record and the photographs contained therein show that the troublesome board missed the joist by a small margin; the gap created was small and difficult to detect. Moreover, Fonseca had no reason to anticipate any problem with the scaffold. On the contrary, when Cenac showed him around the barn, he pointed out several flaws he wanted Mr. Fonseca to correct, such as crooked pilings and a crooked window frame, but he gave no indication that there might be a problem with the boards. Instead he remarked that he and his friends had already worked on them. Fonseca testified at trial that he watched his step, but that it would have taken a miracle to see the gap which caused his fall. We believe that he exercised reasonable caution and that his recovery under C.C. 2317 or C.C. 2322 is not barred by fault on his part.
The decision of the lower courts in favor of defendants, Marlin Marine Corporation and The Home Indemnity Company, is affirmed. The decision in favor of the defendant, Alfred Cenac, Jr., is reversed and the case is remanded to the trial court[9] to fix damages, all at the cost of Alfred Cenac, Jr., defendant.
MARCUS, J., dissents, being of the opinion that the result reached by the courts below is correct.
BLANCHE, J., dissents for reasons assigned by LEMMON, J.
LEMMON, J., dissents and assigns reasons.
LEMMON, Justice, dissenting.
The loose, unnailed boards, randomly placed across ceiling joists in the course of construction, certainly did not constitute a floor, as clearly shown on the following photograph (which a co-worker characterized as illustrative of the position of the boards at the time of the accident):
*681 
When plaintiff, a construction worker, stepped backward onto the very end of the board so as to cause it to see-saw, he can hardly be said to have been trapped by a latent defect. Perhaps if plaintiff had proved that the end of the board was in a corner, or was surrounded by other boards, or was in some way positioned to give the appearance of safety, then the condition created by Cenac might properly be characterized as a latent defect. But the positioning of these boards, rather than constituting a trap, fairly cried out for exercise of extreme caution, particularly as one approached the end of the board.
I cannot conclude on this record that plaintiff proved he was deceived by the positioning of the boards into believing it was safe to step on the end of the board. In my opinion the lower courts properly dismissed both the tort and compensation claims.

ON REHEARING
LEMMON, Justice.
We granted rehearing to reconsider our decision which held defendant Alfred Cenac, Jr. liable for damages incurred by plaintiff in a fall which occurred while plaintiff was completing construction of a barn owned by Cenac. The critical issue for our present consideration is whether plaintiff proved that a defect in Cenac's building caused his injury.
Because Cenac needed a new place to stable his horses, he began construction of a barn in his spare time. Two other friends who owned horses, along with all of the wives and children, joined in the after-hours project.
After the sides and part of the roof had been constructed, Cenac hired plaintiff to complete the structure, agreeing to pay plaintiff and two other carpenters, who frequently worked with him, a stipulated hourly rate. Plaintiff and his helpers first straightened and braced the main supports *682 and then began nailing the remainder of the rafters which were to support the tin roof. In performing the work on the rafters plaintiff and his helpers stood on boards which had been laid by Cenac and his friends across the ceiling joists.[1] The boards had been placed there temporarily to provide a place to stand during the roof construction, and there were no plans to construct a permanent floor or ceiling on top of the joists in that area.[2]
About the third day on the job plaintiff stepped backwards on one of the boards, which apparently did not extend completely to the next joist, and the board seesawed. Plaintiff fell, sustaining the injury upon which this suit is based.
On original hearing this court found that the injury was caused by a defective condition of the premises under construction and held Cenac liable both as the owner of the premises and as custodian at the time the defective condition was created. We granted a rehearing to reconsider whether the evidence established that the dangerous condition (undoubtedly created by Cenac or his friends in a building under his custody) could truly be characterized as a latent defect for which the owner or custodian would be responsible. We now reinstate our original judgment.
At trial Cenac admitted that he and his friends had placed boards across the joists "to walk on," but did not describe the positioning of the boards. On the other hand, plaintiff testified that he and his co-workers did not check or move the boards, but simply "used them as they were." He explained that Cenac and his friends "had worked up there" on the boards and that Cenac had told him "you all can just go to work on it (the scaffolding boards)."
When asked if the boards covered all of the ceiling joists, plaintiff stated "I wouldn't say every inch of it, but it was pretty well covered." He explained his failure to observe the gap which caused his fall by stating "it would have took more than just a miracle to see that one board couldn't reach that ceiling joist because the boards lapped partly on top of the other one."
The record does not contain either photographs of the boards at the time of the accident or detailed descriptions thereof by witnesses trained in investigation.[3] The record, nevertheless, does sufficiently establish that the dangerous condition was latent, because the troublesome board was surrounded by other boards and because the boards lapped end over end. Thus, this is not a case of a person walking to the very end of a single board without first ascertaining that the end is supported. This is a case, rather, in which a group of boards, though unnailed, gave such an appearance of solid support that one would not reasonably expect that the end of one of the center boards (on which other persons had previously worked and on which he himself had worked for a couple of days) was totally unsupported.
We therefore conclude that the group of boards, positioned by Cenac and eventually made available to plaintiff for completing the job, constituted a latent dangerous condition or defective "thing" in Cenac's custody.
Since the apparently safe group of boards was not altered after plaintiff took over the job, Cenac remained responsible for any injuries caused by the defect he created in the thing while it was in his *683 custody.[4] We therefore reaffirm our conclusion that Cenac is liable under C.C.Art. 2317 and 2315.
However, we express doubt as to that portion of our original opinion holding Cenac liable as owner under C.C.Art. 2322. The group of boards were placed there temporarily by Cenac, were removed by plaintiff after the roofing work was completed, and were eventually used to construct the floor of the hayloft. Arguably, the positioning of the group of boards used for temporary scaffolding did not constitute a vice in the original construction, but rather the boards were merely an apparatus used by contractors in performing that construction, never intended as a permanent part of the building for whose original construction vices the Code holds the owner of the building liable. However, since we agree that Cenac is otherwise liable for plaintiff's injuries, we need not determine his liability as owner of the building.
Accordingly, the decree on original hearing is reinstated.[5]
DENNIS, J., concurs with reasons.
MARCUS and BLANCHE, JJ., dissent and assign reasons.
MARCUS, Justice (dissenting).
Assuming that Cenac was either at fault under La.Civ.Code art. 2315 or strictly liable under art. 2317, I consider that plaintiff's claim should be barred either by his contributory negligence or by victim fault. Accordingly, I respectfully dissent.
BLANCHE, Justice (dissenting).
I respectfully dissent. It was obvious that the boards were not nailed in place. The logical fact which should naturally flow therefrom, and especially to a carpenter with 26 years' experience, is that one of the boards might give way. This writer is unable to stretch a case for liability so as to find a "latent" defect in the "thing," and would find the plaintiff was injured solely because of his own gross negligence.
NOTES
[1] Article 5, § 5, La.Const. of 1974 provides in part:

"(C) Except as otherwise provided by this constitution, the jurisdiction of the supreme court in civil cases extends to both law and facts. In criminal matters, its appellate jurisdiction extends only to questions of law.
"(F) Subject to the provisions in Paragraph (C), the supreme court has appellate jurisdiction over all issues involved in a civil action properly before it."
C.C.P. 2164 provides in part:
"The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal...."
[2] See Doss v. American Ventures, Inc., supra; plaintiff entitled to compensation for injuries he incurred on a construction project because defendant building owner was engaged in the construction business when it had its executive officers act as general contractors and supervise the reconstruction of a building it owned and rented. See also Slocum v. Lamartiniere, 369 So.2d 201 (La.App. 3d Cir. 1979), writ denied 372 So.2d 569 (La. 1979); plaintiff covered because injured while constructing building to house new grocery for defendant grocer; Paige v. Tregre, 283 So.2d 777 (La.App. 1st Cir. 1973), writ not considered 284 So.2d 335 (La. 1973); plaintiff injured while clearing debris from land leased by defendant to pasture cattle was covered by workmen's compensation act because defendant raised the cattle as a sideline, even though his principal occupation was merchant.
[3] See McMorris v. Home Indemnity Insurance Co., 236 La. 292, 107 So.2d 645 (1958); injured worker not entitled to compensation because defendant was building home for personal use; Jason v. Blanchard, 300 So.2d 647 (La.App. 3d Cir. 1974); plaintiff injured while demolishing barn and clearing lot not entitled to compensation because property was not connected with defendant's business; Stigler v. Bell, 276 So.2d 799 (La.App. 4th Cir. 1973); plaintiff not covered because injured while working on a structure owned by the defendant employer, but not connected with his trade or business.
[4] "Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agricultural field occupations." R.S. 23:13.

C.C. 2315 provides in part:
"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."
C.C. 2316 states:
"Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."
[5] R.S. 40:1672 provides:

"All scaffolds, hoist cranes, stays, ladders, supports, or other mechanical contrivances erected by any person for use in the erection, repairing, alteration, removing, or painting of any building, bridge, viaduct, or other structure shall be constructed, placed, and operated so as to give proper and adequate protection to any person employed or engaged thereon or passing under or by it, and in such a manner as to prevent the falling of any material that may be used or deposited thereon."
The provision applies only to cities of over 15,000 population.
[6] C.C. 660 states:

"The owner is bound to keep his buildings in repair so that neither their fall nor that of any part of their materials may cause damage to a neighbor or to a passer-by. He is answerable for damages caused by his neglect to do so."
C.C. 2322 provides:
"The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
Since it is generally agreed that the text of article 660 restricts its application to neighbors and passersby, we will not discuss it in this case. Ciaccio v. Carbajal, 142 La. 125, 76 So. 583 (1917); Cristadoro v. Von Behren's Heirs, 119 La. 1025, 44 So. 852 (1907).
[7] C.C. 2317 provides:

"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
[8] It is said that the underlying policy of article 2317 is to place the burden of loss, between an innocent victim and the innocent owner of the thing which causes injury, on the owner because he has the use and benefit of the thing. See Verlander, 25 Loy.L.Rev. 263, 275 (1979).
[9] Counsel for plaintiff and defendants stipulated at trial that the trial would only involve the liability question, and that the amount of damages would be determined later if necessary.
[1] Ceiling joists are small beams which extend parallel from wall to wall to support the ceiling. The joists and the boards laid across them to form a sort of scaffolding were in place when plaintiff came on the job.
[2] The photograph attached to the dissenting opinion on original hearing was taken after the accident and after the building was completed. The series of photographs were introduced by the defense to show the joists and the type of boards used, and not to show the positioning of the boards at the time of the accident.
[3] The extent of the injury allegedly did not manifest itself immediately, and plaintiff continued on the job until the barn was completed. Therefore, plaintiff and his co-workers, all uneducated carpenters, were the only available witnesses.
[4] On this record it is more probable than not that the boards did not shift positions and were not moved unintentionally. According to plaintiff's testimony, the boards were heavy and did not move without exertion of special effort. He generally used unnailed scaffolding and did not consider the boards used on the job unsafe, except for the hidden misplacement of the one board which caused the fall. In fact, after the accident plaintiff and his co-workers simply placed this board in the correct position for support and continued to work on the boards.
[5] It was pointed out that the court failed to cast Home Indemnity Company in judgment as Cenac's insurer. Since the case was remanded for fixing damages, the trial court can also adjudicate issues of insurance coverage and limits in rendering judgment.